309-1008 Reed Pouk, et al. Appellant by Michael Rasek v. The Village of Romeoville Appellate by Michael Newkirkson Counselor, may we proceed? Thank you. Good morning, Your Honor. My name is Michael Rasek. I'm here on behalf of the appointed appellant, Marie Pouk, who is the administrator of her daughter's estate. This, of course, the facts are very simple. Christina was driving her car, stopped for a stop sign at the roadway. There was a bush on her left on private property. She was unable to see the car coming towards her. He was unable to see her. When she pulled out, she was struck and killed. The question before this Court is which part of the Tort Immunity Act the Village of Romeoville will be allowed to take advantage of. Our position, of course, is that if they want to seek an immunity, they have to look to 2-202, because the reason that the bush was there was because of the conduct of the village in enforcing its ordinance. The village's position is that we weren't enforcing anything, so we're entitled to take advantage of either 2-103, which is absolute immunity for failure to enforce the law, or 2-105, which is absolute immunity for negligent inspection. I guess the question comes down to what does dismet mean when it says that 2-202 requires some affirmative conduct by the municipality. In this case, our position is that the affirmative conduct that was missing in dismet, Your Honors may recall in dismet, there was a call for help, but no one came, and that was the key to the case. In this case, when the property owner called the village, I hate to call it help because it didn't work, but the village responded. The village came and said you violated the ordinance, and that's fine. So there's no negligent inspection. The village did its inspection. They found a violation. The problem occurs, of course, when the village is told, well, we've cut the tree, and the village tells the landowner, don't worry, we're not sure you cut it enough, but we'll come back and take a look, and we'll let you know. And then, of course, the landowner calls back to the village and says, well, we're gone, we're in Florida, but we want to make sure this is right. So if this is not okay, you let us know. I mean, they actually prompted the village to do it. Nothing happened, and five, six months later, the accident happened because of that instance, because of that problem. And our point is simply this. The village did take a role in the case. It took a role much like the police officers in the Fatigado case. I think the same occurrence was in Ozick as well, where they stopped the drunk driver and then let him go. And once the municipality takes an active role, they have to follow through correctly. It's somewhat analogous to the Herman v. Township of Will case from years ago, where the court said they put some gravel down on the road and hadn't tamped it down. A poor guy driving along on a small moped or motorcycle has the gravel, and it's sunk in. And the ruling there was if you don't start the process, then you don't have a duty. Now, it was a separate statute. I understand that. But once you start the process, you have a duty to carry it through. And they started the process through here, and the people who own the property relied on that. That's, I think, paragraph 64 of our complaint. We would have changed it if the village would have told us we weren't in compliance. We based it upon that. If they hadn't done it, if the village had followed through, there would have been no problem. Well, wouldn't it? I mean, couldn't any homeowner or property owner, if they had a problem out there, have said, well, in fact, stand responsible? My gosh, had I known I was in violation of an ordinance, I would have done something different. But the city never told me I was in violation, or the police never told me, or somebody never told me. That's very true. And that's not this case, though. I agree. Otherwise, everyone would say, well, nobody told me. I didn't even know there was an ordinance. The problem here is that they knew about the ordinance the process had started, and that's what makes it different than the where case. That's the porch collapse case that they relied upon. There, the city did an inspection, but they didn't tell the people with the porch it's okay. I think that's what would make it different from your honors hypothetical. Once I make the phone call, or in this case, it could happen either way. I could call the village and say, is this tree okay? Or the village could come to me and say, as they did here, your tree is not okay. Get it fixed. And when I fix it, I call back to the village and say, is that okay? Well, we're not sure, but we're going to check it. I think that's a different scenario. And I suspect what your honor is concerned with is there is no general duty on any of these levels. We can't have villages running around and municipalities running around. But once the village takes that role and changes it, keeping in mind if the village had simply said, well, we're not going to tell you anything, then presumably the people would have looked at it and talked to the cyberts and made sure it was okay. They really relied upon the village. I'm not aware of another case that's exactly like this, with this limited exposure. The other tort immunity that, of course, they rely upon is 2-103, which is failure to enforce the law. They are enforcing the law here, just like they did at Datagato, just like they did in the Ozick case. Like they would have been doing in Desmet if the police officers had come to the scene and actually begun their actions. If I could just move to, there are some alternative defenses or some alternative grounds that were not discussed in the trial court. Normally these cases get remanded and let the trial court finish up what it needs to finish up. But one of the cases that on its face, Kirschbaum, when I first saw this citation, I was somewhat concerned because Kirschbaum said you don't have a duty as a municipality to be removing bushes and trees on private property. But when you look at Kirschbaum, as we said in our brief, that case was brought on a different foundation. The plaintiff in Kirschbaum relied upon 3-102A for the proposition that the city does have a duty to keep its roads in safe position. And the court held all they had to do was put up a stop sign at the intersection and they did that. But within Kirschbaum is actually the seeds of this case. The court in Kirschbaum pointed out, and we've got the actual page cited in the brief, that there wasn't a duty there. But if the municipality had an ordinance that required this to be done, that would be a different factor. Now you would have a municipality with an ordinance requiring it to take action. And that's what we have in this case. We have a municipality with an ordinance requiring that these intersections, quite reasonably, not have anything over 3 feet tall within 30 feet of either way. And they got actively involved and went out and said, cut them. Okay, we cut it. Is that okay? And they said, we will let you know. And the people said, well, if we don't hear from you, quite reasonably, we'll assume that what we got done was okay. Is the not hearing from them, can that be considered a termination of the Village Cities Act? That was what the court in the Ware case found. Now we're in Anthony. They simply forgot or bureaucratically lost it. Lost and shuffled. If the case gets remanded, I face that specter. But at this point, that's not before the court. And what we do have, though, is the fact that as soon as the accident happened, the enforcement continued on through the same enforcement. They had the village cut. I'm sorry, the village had the tree cut. In the Anthony case, the court said that there had been a housing court action, but that the city had stopped in the housing court. There's no evidence here that the city stopped it. All the court has before it, of course, is the complaint and the ordinances and the fact that there's a stop sign. But there is no evidence that anyone stopped. And the last evidence that we have is something in motion. We will let you know if it's not okay. And at that point, I submit to the court that we've brought ourselves within that part of dismay that allows these cases because you have an affirmative act. I always hate to say this. It's seemingly a simple case, but underneath it, all kinds of layers of tort immunity that always arise. Unless your honors have some further questions, I think our briefs have made it clear. Thank you. Thank you, Counselor. Good morning, Your Honors. Mike Persani on behalf of the Appali village of Romeoville. Your Honors, in this case, the circuit court properly dismissed the third amendment complaint on statutory immunity grounds. The facts are very straightforward. The village of Romeoville cited the private property owner with a zoning code violation in late November of 2007. The property owner tried to comply with what the village said was not in compliance by hiring a landscaper to cut down or trim down the bushes at the intersection. A few days later, the property owner called the village code inspector and said, you know, the landscaper cut it down and said that the view was clear. And at that time, the village code inspector went out and looked at the property, told the landowner that he did not believe that the bushes were cut down enough. They were not trimmed down enough, but that he would have his supervisor check the property and get back to her. Supervisor, according to the complaint, didn't get back to her or didn't check the property. The village didn't get back to her. And all that occurred in early December of 2007. The accident here, the failed accident here, occurred five months later. If you boil down the third amendment complaint to its essential facts, free of conclusions and free of irrelevant factual allegations, what it comes down to is this. The village of Romeoville failed to re-inspect the property. And the village of Romeoville failed or refused to enforce its zoning code requirement that site triangles at the intersection be kept clear of any obstructions. I think it's very telling when I listen to counsel's argument. When he described the facts, after he got done reciting the facts, what he said was that the village did nothing. And that characterization is absolutely accurate. Because at that point in time, when the inspector had this conversation with the property owner, all efforts at enforcing the ordinance had effectively ceased. The village did nothing after that point in time. Now, that makes this case governed by section 2-103 of the Tort Immunity Act, which provides immunity for injuries caused by the failure to enforce any law, and section 2-105, which provides immunity caused by the failure to make an inspection or by reason of making inadequate inspection. Let's assume for the sake of argument that the inspector supervisor had gone back out there and found that the bushes, he felt the bushes were in compliance. And the accident still occurred. We'd still be in the same place, the exact same place. The village ceased any further efforts to enforce its ordinance. It didn't bring the property owner to court. It didn't follow up with another notice. It didn't, you know, recommend another landscape or whatever the village's actions may be. The fact is that there was no further action in counsel's words after early December of 2007. Now, both of these immunity provisions provide absolute unqualified immunity, immunity from negligence, immunity from lawful wanted conduct. That's what the legislature has deemed necessary under these circumstances. In the code inspection context, the appellate court has uniformly applied these immunities to very similar facts. The Ware case involved a porch collapse. In that case there, the porch was built without a permit, did not comply with the city of Chicago's code. Inspectors had been out to the property, had seen the problem, seen that the porch was not in compliance, and failed to report those violations. The appellate court in Ware found that 2103 and 2105 provided immunity. In the Bowler case, the owner of the property then involved a roof deck, a young boy that fell off a roof and didn't have a protective guard around the perimeter of the roof. The owner had actually been cited by the city for code violations and taken to court by the city. And in fact, there are allegations in the complaint in Bowler that the city inspectors had made false representations to the administrative law judge in that case about whether the roof had complied with the city code. And even with all those facts, the court again boiled it down to the essential fact that the city did nothing after citing the property owner or bringing the property owner to court to enforce its ordinance and found that the immunity was applied. And finally, the Anthony case, which is the nightclub case, where the second floor of the nightclub was deemed to be uninhabitable, couldn't be occupied. The city, again, in that case, filed a housing court complaint against the property owner and in fact received an order from the court prohibiting occupancy of that second floor. Disturbance occurred. People were injured trying to exit the second floor of the nightclub. The city got sued. Again, in that case, like our case here, all efforts at enforcing the ordinance had ceased. In that case, there was even still a pending administrative law case or housing court complaint, still pending. Again, the court found that there was immunity provided by both 2103 and 2105. Now, what those cases also stand for is that 2103 and 2105 cannot be read in conjunction with the Wolf and Wanton exception stated in section 2-202. That the absolute immunities provided by the immunity for failure to enforce the law or failure to conduct an inspection are not limited by the Wolf and Wanton exception under 2-202. The plaintiff here has attempted to, the plaintiff, I think, knows this, obviously. And this is now their third go around at trying to craft or manufacture a claim out of these facts against the Village of Romeoville. And so they've tried to... Can you speak to 2-202? 2-202? 2-202. Yeah, absolutely. Yeah, absolutely. First of all, I don't think this is a case in which 2-202 applies at all. 2-202, according to the Ware case, the Anthony case, and most recently the Reese v. City of Chicago case, if you look at the language of 2-202, it applies to public employees. It says, public employees shall not be liable for negligently enforcing or executing the law unless their conduct is Wolf and Wanton. And so what the courts in those cases have said is that 2-202 does not provide an independent basis of liability. You have to look at whether 2-202 applies in the context of Section 4-102 of the Tort Immunity Act, which essentially states that there's immunity for both public entities and public employees for failing to provide adequate police protection or police service. Now, the court de-submit, and you have to look at the origin of the cause of action under 2-202, which is Doe v. Calumet City, a case which had very outrageous facts and a case in which the Supreme Court de-submit severely limited and cut back, and I'd say even just short of overruling if you look at what de-submit had to say. In the Doe case, and this is where I think you have to look to see whether the plaintiff has stated the cause of action here. In the Doe case, the police actually responded to the scene of an intruder who was harming children inside an apartment. And the officer took supervisory control of the scene at the time that the injury was occurring. And the officer refused to go into or enter the apartment to save the children. And the officer even went so far as to prohibit or prevent others from entering the apartment to save the children. Under those facts, de-submit said that Doe really is confined, and the cause of action under 2-202 is really confined to the facts or the similar facts stated in Doe. And that is that the officer was there, asserted control at the time, and the court de-submit even likened it to the special duty doctrine, in which in order to create a duty of care different than what a municipality owes to the general public, the injury has to occur while the plaintiff is under the direct and immediate control of the municipality. De-submit said that's the only way you can distinguish Doe versus Calumet City. That's the only way you can really explain why the court recognized a 2-202 cause of action, so to speak, in Doe, was to find that the officer there asserted control by affirmative acts of not breaking into the apartment, not allowing others into the apartment. That's not what you have here. The Village of Romeoville, again, this is a failed accident that occurred five months later. The Village of Romeoville was not on the scene of this accident. The Village of Romeoville was not enforcing or executing the law at the time of the accident, and certainly they had no control over the scene at the time of the accident. This case does not resemble Doe, and it certainly does not give rise to the degree of control necessary to state a cause of action, as the Supreme Court stated that it should under Doe versus Calumet City in the de-submit case. If you look at the Anthony case, the Anthony case, the appellate court, again, under very similar facts, rejected the exact same cause of action that the plaintiff is asserting here, and going so far as to say that the city was essentially doing nothing and was not exerting any control. There was no cause of action, no course of action occurring at the time of the injury. The plaintiff makes mention of the Herman case. Your Honors, that's a property maintenance case. That's a 3-102 case. 3-102 states in the Tort of Mediacy Act that a municipality must maintain its own property in a reasonably safe condition. That has nothing to do with 2-202 whatsoever. Are you saying, then, that the remedial actions have to be almost at the point of the act? Yes. That you can't be a block away or 10 minutes away from enforcing the act. You have to be on the job doing it. I think that in the code inspection context, I think that's absolutely right. I think you'd have to be. In fact, I think in the code inspection context, the inspection itself somehow would have had to cause the injury. In other words, this is probably a ridiculous example, but the inspector drops a tape measure on someone's foot or something like that. But if it's just the inspector who says, I think that those bushes comply with the ordinance, and I'm not going to do anything further, which is what happened here, I'm not going to re-inspect, I'm not going to take it to court, that's a failure to enforce the law. That's not control of the scene. So whether it occurred the day after the phone call, the accident, or whether it occurred five months later, it probably doesn't matter. It's still the same thing. It's a do-nothing case. And the legislature has deemed it necessary that municipalities have immunity under those circumstances. Now, if you look at the, I'm sorry. No, no, no, I'm sorry. What you're saying, I'm guessing, is that, I'm trying to think of other examples, but mostly police fire kind of situations where some crisis is occurring and they're there. And if they do it willfully and wantonly, then they're liable. Otherwise, the village is liable. But otherwise, nothing. Yeah, I can't think of a circumstance in the building, or the code inspection context, where the code inspector would be taking actual control over the circumstances to the extent that they are in a course of enforcing the law and that would cause an injury. It's probably, thank you. But it's certainly much closer in the police and fire context, certainly. And I think that's what 4102 is primarily designed to address. That is, municipalities cannot guarantee the safety of the general public. They can only be liable if they've established a special relationship or a special duty to an individual, a specific individual. And so even in the code inspection context, there still has to be that type of special relationship to that individual, that special duty to that individual, not to the general public at large, because that would run afoul of the immunity provided under Section 4102. So, yes, I think that in the code inspection context, you'd have to have the plaintiff, or in this case the decedent, the plaintiff's decedent, there, and somehow the code inspectors have to have control over that person. I think that's the only way in this context you could state a cause of action. Even if you look at the Reese case, which is a recent case involving a prisoner who had stolen a squad car, the police pursued this person, and this person ended up getting into an accident with somebody else. And the appellate court rejected an argument that 2-202 applied under those circumstances and stated that the police did not control the scene of the accident, the police were not present at the scene when the accident occurred, and, most importantly, the police did not have direct control over the prisoner who was fleeing in the stolen squad car. You know, that may get you closer to where you could state a cause of action and willful one, but at this point the appellate court has uniformly held that those circumstances don't give rise to that cause of action. Your Honor, I'll just refer to the briefs on the other arguments. We did make arguments on the issue of duty and willful wanton conduct as well as proximate cause. I'll just refer to the briefs on those arguments, and we ask that you affirm the judgment of the appellate court dismissing this case with prejudice. Thank you. Thank you, counsel. I will be brief. I know the court hears that frequently, but I think I can't be this time. Inspection is not the issue, and that's the problem here. And it's not that they did nothing. It's that when they talked to the owner, by doing nothing they signaled approval to the owner. That's the affirmative act that makes this different than the other cases. The concept that you have to have the injury and the wrongful act be simultaneous, that would mean that fatigata or fatigata was wrongly decided because there the police officers released the drunk driver and the accident didn't happen in front of them. The accident happened subsequently. So it's clear that you can have the negligent conduct here and the effect of that conduct down the road, and at least some courts are willing to say that's still enforcing the law. Why they didn't go back might be relevant on remand. If there's evidence that the village ran into a budget problem and all of their enforcement officers were laid off, we're going to have a great deal of difficulty proving Wolfman wanted conduct, I would suspect, which is what we have to do under 2-202 to avoid 2-202. But that's not before this court. Right now all we have is the complaint. The complaint says that the property owner acted as she did in reliance upon what she was told by the village, and if they had told her something else, she would have fixed it. Unless the court has... Oh, I'm sorry. Reese counsels correctly addressed it in our brief. Unfortunately, I'm as familiar with Reese as I am with DeSmet and Anthony. I managed to lose all of them. But in Reese, the appellate court actually said that the city had to control the scene of the accident. It was a fleeing felon who stole a cop car and was being chased by the other police, and there was an accident. The charge was that he should have been chased. If he hadn't been chased, he wouldn't have been driving through the street at 80 miles an hour. That's the only case that I've seen that has held that 2-202 can only be applied if the conduct that is being charged against the police officers involves a situation where they control the person they're chasing, and the Supreme Court did take that case for review, and that is one of the issues on review. That's about the best I can say at this point. Unless Your Honor has any further questions, obviously we ask for a reversal and remand. Thank you very much. Thank you, counsel. The court will take this case under advisement, and then we'll adjourn for the next panel to take their seats, and we will render a decision at this time.